UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FILED

DEC - 2 2009

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal Action No. 04-128-1 (RMC) |
| | ) | UNDER SEAL |
| JONATHAN FRANKLIN, | ) | |
| | ) | |
| Defendant. | ) | UNSEALED |
| | ) | |

## MEMORANDUM OPINION

Jonathan Franklin is serving five life sentences after a jury convicted him of a

narcotics conspiracy, a racketeering conspiracy, leading a continuing criminal enterprise, drug

trafficking, using a telephone to support drug trafficking, various weapons crimes, and selling drugs

within 1000 feet of a school. Before the Court is his motion, pursuant to 18 U.S.C. § 2255, for a new

trial because of ineffective assistance of trial counsel. Specifically, Mr. Franklin assails trial

counsel's strategy to concede the counts alleging drug trafficking, use of a telephone for drug

trafficking, and selling drugs within 1000 feet of a school, in an unsuccessful effort to establish

credibility with the jury and gain acquittals on the conspiracy charges, the continuing criminal

enterprise charge, some of the gun charges, and a set of counts concerning a murder and shooting,

each of which exposed Mr. Franklin to a life sentence. Mr. Franklin argues that the concessions

alone meant he would get a life sentence, that he did not agree to concede to a life sentence, and that

his counsel was legally ineffective. The Court held an evidentiary hearing on the motion and has

carefully considered the testimony and the parties' briefs.[1]  For the reasons elaborated below, the

motion will be denied.

---

[1] The hearing was held on August 27 and November 2, 2009. Citations to testimony are to "Tr. I" or "Tr. II" respectively, page number, and a parenthetical identifying the witness.

# I. FACTS

## A. Procedural Background

In a 159-count superseding indictment filed on October 19, 2005, a grand jury charged Mr. Franklin, Joseph L. Blackson, William Dee Robinson, William H. ("Mike") Simmons, George Wilson, and 14 others with narcotics conspiracy, in violation of 21 U.S.C. § 846; racketeering conspiracy ("RICO" conspiracy), in violation of 18 U.S.C. § 1962(d); continuing criminal enterprise ("CCE"), in violation of 21 U.S.C. § 848(a) & (b); murder and other violent crimes, in violation of D.C. Code §§ 22-2101, 22-401, 22-4502, and 18 U.S.C. § 1959(a); narcotics trafficking, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1), and 860(a); unlawful use of a communications facility, in violation of 21 U.S.C. § 843(b); and various weapons crimes, in violation of 18 U.S.C. §§ 922(g)(1) (possession of a gun by a felon) and 924(c)(1) (use of a gun in furtherance of drug trafficking).[2] On December 16, 2005, pursuant to 21 U.S.C. § 851(a)(1), the Government filed a notice of the applicability of enhanced penalties concerning Mr. Franklin's prior conviction of possession with intent to distribute cocaine.

The defendants were divided into three groups for trial. The first group, consisting of Messrs. Franklin, Wilson, Simmons, Robinson and Blackson, were tried before a jury from March 6 through May 22, 2006. On May 25, 2006, the jury convicted Mr. Franklin of the narcotics conspiracy (count 1), RICO conspiracy (count 2), CCE (count 3), distribution of PCP within 1000 feet of a school (counts 8, 10, 17, 30, 37, 42, 58, 69), distribution of PCP (counts 21, 36, 41, 51, 53, 63), distribution of ten grams or more of pure PCP (count 44), distribution of cocaine base (counts

---

[2] A separate indictment charged the suppliers who obtained phencyclidine (PCP) from California for sale in the D.C. area, *see United States v. Bascom*, Crim. Action No. 04-127 (D.D.C.), but each of those defendants pled out just before trial in July 2005.

45, 52), distribution of Ecstasy (count 50), distribution of Ecstasy within 1000 feet of a school (count 57), distribution of 5 grams or more of cocaine base within 1000 feet of a school (count 67), possession with intent to distribute PCP and Ecstasy (count 77), possession with intent to distribute Ecstasy (count 78), unlawful use of a communications facility (counts 83 to 109), use or possession of a firearm during a drug trafficking crime (counts 135, 137), and possession of a firearm by a convicted felon (counts 136, 138).  The jury acquitted Mr. Franklin of the murder, assault, and weapons charges related to the March 28, 2003 murder of Kevin Lurk and shooting of Shelby Anderson (counts 129-132, 148-49, 158-59).  At trial, Mr. Franklin was represented by Arcangelo Tuminelli and Elita Amato.

On August 18, 2006, the Court sentenced Mr. Franklin to concurrent terms of life imprisonment on the CCE, narcotics- and RICO-conspiracy convictions, and two of his drug trafficking offenses (counts 1, 2, 3, 44, 67), concurrent terms of 30 years' imprisonment for the remaining drug distribution offenses (counts 8, 10, 17, 21, 30, 36, 37, 41, 42, 45, 50, 51, 52, 53, 57, 58, 63, 68, 77, 78), and concurrent terms of 4 years' imprisonment for the unlawful use of a communications facility offenses (counts 83 to 109), and to consecutive terms of fives years' and twenty-five years' imprisonment for the § 924(c) offenses (counts 135, 137).

Mr. Franklin filed a timely notice of appeal, which is pending.  On appeal, among other arguments, he advanced the claim that his trial counsel provided ineffective assistance.  The D.C. Circuit remanded that issue to this Court for determination.  *United States v. Franklin*, No. 06-3140 (D.C. Cir. Nov. 7, 2008); *see, e.g., United States v. Reeves*, No. 07-3130, 2009 WL 3735511, at *5 (D.C. Cir. Nov. 10, 2009) ("'In this circuit, when an appellant makes an ineffective assistance of counsel claim for the first time on appeal, we generally remand for a fact-finding hearing, at which

the district court can explore whether alleged episodes of substandard representation reflect the trial

counsel's informed tactical choice or a decision undertaken out of ignorance of the relevant law.'")

(quoting *United States v. Mouling*, 557 F.3d 658, 668-69 (D.C. Cir. 2009)).

### B. The Basis For Mr. Franklin's § 2255 Motion

The Government's case against the "M Street Crew" was based on a mountain of

evidence. It presented video from pole cameras, still photographs, audio and video undercover drug

buys, wiretaps, seizures from multiple search warrants, testimony from cooperators, and experts.

The case was developed through an investigation by the Federal Bureau of Investigation's Safe

Streets Task Force and the Metropolitan Police Department, led by MPD Detective Joseph Sopata

and FBI Special Agent Rich Stallings. Beginning in August 2002, they investigated the area of 18th

and M Streets N.E., Washington, D.C. The investigation culminated in a "take-down" on March 16,

2004. On that date, more than 350 law enforcement officers simultaneously executed scores of

search warrants, including 26 in the D.C. metropolitan area. A total of 40 arrests were made in

connection with the investigation. All defendants either pled guilty or were convicted by a jury.

The evidence of Mr. Franklin's drug dealing and use of telephones to facilitate drug

dealing was particularly compelling. The Government played almost one hundred intercepted calls

between Mr. Franklin and his wife, Elizabeth Lee, who decanted the PCP into ounce and half-ounce

bottles; between Mr. Franklin and Monica Bell, who tested each batch of PCP for quality; between

Mr. Franklin and Messrs. Ronnie Tucker, Dwaine Williams, James Hill and Ed Spears concerning

drug dealing; and between Mr. Franklin and William Dee Robinson and George Wilson concerning

drug dealing and the sales at 18th and M. It had picture-perfect video and audio of Mr. Franklin

selling PCP and Ecstasy to undercover officer Donna Leftridge and to others. The strength of the

case was such that Mr. Franklin began conversations with the Government in July 2005 about a plea deal.

Mr. Franklin and his lawyers first met with the prosecutors to hear about the Government's case against him. Thereafter, Mr. Franklin spoke openly with Special Agent Stallings and Detective Sopata or the prosecutors on six occasions, debriefing about the M Street Crew, his role in supplying PCP and Ecstasy, the accompanying violence, and the murder of Mr. Lurk and shooting of Mr. Anderson. Mr. Franklin acknowledges that he spoke with the prosecutors and law enforcement agents because the evidence against him was "very strong." Tr. I, 43, 50 (Franklin). He had discussed "all the aspects of the case" and "reviewed all of" the video and audio tapes with Ms. Amato, who said the Government's case "was very strong" and he agreed. *Id.* at 41, 43, 50, 52. He was aware prior to deciding to go trial that if he were convicted, he could be sentenced to life in prison. *Id.* at 44.

The Government offered a cooperation plea, whereby Mr. Franklin would have to testify against his co-defendants. *See id.* at 46. The Government made arrangements for Mr. Franklin and his lawyers to meet privately with co-defendants Joe Blackson, Mr. Franklin's brother, and Mike Simmons, Mr. Franklin's cousin, and their lawyers so that Mr. Franklin could try to persuade his two relatives to enter pleas. *See id.* at 48-49. Mr. Blackson refused to attend. *See id.* at 48. Mr. Simmons refused to agree.[3] *See id.* at 49. Although urged by his lawyers to accept, *see id.* at 51, 90, Mr. Franklin refused the plea deal, *see id.* at 49, 92. He told his lawyers that he was

---

[3] Mr. Franklin talked to Mr. Simmons "about the case and all of the evidence that was against . . . me and him and the other co-defendants." Tr. I, 49 (Franklin). "We talked about all the different options that we had. And I tried to convince him to cooperate [but] he came to a conclusion that that's something that he didn't want to do." *Id.*

interested in a non-cooperation plea but the prosecutors refused. *See id.* at 50. Mr. Franklin could

not bring himself to testify against Mr. Blackson or Mr. Simmons. *See id.* at 46-49. The plea

negotiations broke down because "he would not agree to testify against Mr. Simmons or his brother

Joseph Blackson." Tr. II, 19 (Tuminelli). "His decision after that meeting was that he wouldn't

plead if it required cooperation." *Id.* at 21.

　　　　　　Between the take-down day in March 2004 and trial in March 2006, Mr. Franklin met

with one or both of his counsel at least once a month and developed a "pretty cordial" relationship.

Tr. I, 52 (Franklin). Once Mr. Franklin rejected the last opportunity for a pre-trial plea in November

2005, his lawyers thought their options very slim. The evidence was strong. Mr. Franklin could not

present contrary evidence because, if he did through his own testimony or others', his statements

during the debriefings could be used against him. *See* Tr. II, 25 (Tuminelli); Dkt. # 1090, Ex. 2

(August 4, 2004 Debriefing Letter). And, the CCE and murder counts carried statutory mandatory

life sentences if he were convicted. Client and counsel repeatedly discussed trial strategy. *See* Tr.

I, 52-58 (Franklin); Tr. II, 26-31 (Tuminelli); Tr. II. 97-98 (Amato). Mr. Tuminelli suggested a tactic

to "concede to the obvious," such as the "Donna Leftridge taped buys" and narcotics "[d]istribution."

Tr. I., 53 (Franklin); *see also id.* at 97. He also would concede the gun-possession-by-a-felon counts

and those charging use of the telephone to facilitate drug trafficking. *See id.* at 53-55, 100. But there

would be no concession to the narcotics or RICO conspiracies, the CCE, the Mr. Lurk murder or Mr.

Anderson shooting, or use of a gun in furtherance of drug trafficking (§ 924(c)). *See id.* at 55, 98-99.

This strategy was adopted because "the evidence with Donna Leftridge was very strong" and the

concession could "give the jury trust on the other counts." *Id.* at 56. "Basically with his strategy we,

when we talked about it, it was basically to make sure that I didn't get a life sentence." *Id.* Mr.

Tuminelli's goal "was to make sure that I didn't get life and that by conceding to the distribution counts, the worse [sic] possible sentence I would have gotten would have been 30 years, if everything went like he wanted it to go." *Id.* at 57. Ms. Amato agreed with the strategy. Tr. II, 98 (Amato). Mr. Franklin and his lawyers discussed the United States Sentencing Guidelines as they applied to the trial strategy "a couple of times." Tr. I, 57-58 (Franklin).

Mr. Tuminelli "told Mr. Franklin that I had done this in other cases and had been successful in some and not successful in some . . . ." Tr. II, 26 (Tuminelli). Mr. Tuminelli did not promise that the strategy would succeed or tell Mr. Franklin that the strategy was likely to succeed. *Id.* at 30-31. "I told him he had a chance that it could be successful." *Id.* at 30. Mr. Franklin admits that Mr. Tuminelli "didn't promise me that the strategy would work, but he basically brought my confidence up by telling me that he applied this strategy several times in Maryland." Tr. I, 105 (Franklin). "I believe he said he applied it in Maryland, he told me a case that he had with someone that did this and basically because he's my lawyer and I trusted him, and was being optimistic at the time I wanted to believe that that, the better, the best outcome of the case would happen." *Id.* at 105-06. "[A]fter I decided not to plead," Mr. Tuminelli "told me that he will go in there and do everything he can to make sure that I don't get a life sentence." *Id.* at 106. However, Mr. Franklin understood that he would not get a life sentence only if everything worked perfectly, that is, "if everything, if, if [Mr. Tuminelli's] plan went right." *Id.* Mr. Franklin was not told that this was likely to happen, only that Mr. Tuminelli "believed that it could happen." *Id.* "I mean, that was his goal." *Id.*

Mr. Tuminelli testified that "since the guidelines had become advisory, I told Mr. Franklin look, if we can avoid, you know, the statutory mandatory life sentences, it will be up to

Judge Collyer even if she wants to give you a life sentence based upon a guideline, you know, requiring a life sentence, she doesn't have to give it to you." Tr. II, 27 (Tuminelli). "So the bottom line was we were trying to avoid the statutory mandatory life sentences and we were trying to limit his guidelines to something less than life and [as a] last resort even if we had guidelines of life, he was still in the position to get less than life. That's what we were trying to do." *Id.*

Mr. Franklin agreed with the strategy. Tr. I, 58 (Franklin). Nonetheless, he now insists that had he known that the concession strategy could have resulted in a life sentence, he would have entered into a cooperation plea. *Id.* at 76. "I would have definitely cooperated . . . because my ultimate goal was not to get life. I don't think that I would have chose [sic] to do life in jail even because they [Messrs. Blackson and Simmons] didn't want to cooperate. I know that I wouldn't have done that. I know that I would have cooperated." *Id.* at 76-77.

## II. LEGAL STANDARDS

The Supreme Court has articulated two separate standards for evaluating the effectiveness of trial counsel in a criminal case. Mr. Franklin argues that his counsel were constitutionally ineffective under either one but he urges the Court to follow *United States v. Cronic*, 466 U.S. 648 (1984), under which circumstances may "justify a presumption of ineffectiveness . . . without inquiry into counsel's actual performance at trial." *Id.* at 662. Under the *Cronic* line of cases, courts will presume a *per se* violation of the Sixth Amendment right to counsel only "'if counsel *entirely* fails to subject the prosecution's case to meaningful adversarial testing.'" *Bell v. Cone*, 535 U.S. 685, 697 (2002) (quoting *Cronic*, 466 U.S. at 659) (emphasis in original); *United States v. Hughes*, 514 F.3d 15, 18 (D.C. Cir. 2008) (noting that the presumption of constitutional ineffectiveness arises in a "very narrow range of situations"). "[T]he attorney's failure must be

complete." *Bell*, 535 U.S. at 697; *see also Wright v. Van Patten*, 552 U.S. 120, 124 n.* (2008) (same). *Cronic* is "reserved for situations in which counsel has entirely failed to function as the client's advocate." *Florida v. Nixon*, 543 U.S. 175, 189 (2004); *see also United States v. Holman*, 314 F.3d 837, 839 n.1 (7th Cir. 2002) ("*Cronic* only applies if counsel fails to contest *any* portion of the prosecution's case") (emphasis in original).

Except in those rare circumstances where deficient performance can be presumed under *Cronic*, a court evaluates claims of ineffective assistance of counsel under the standard enunciated in *Strickland v. Washington*, 466 U.S. 668 (1984). "Most ineffectiveness claims proceed under *Strickland v. Washington*'s familiar two-step framework, which requires (1) showing 'counsel's representation fell below an objective standard of reasonableness' and (2) demonstrating 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Hughes*, 514 F.3d at 17 (quoting *Strickland*, 466 U.S. at 687-88, 694); *see also Mouling*, 557 F.3d at 668 (under *Strickland* a defendant "must show two things: that his lawyer made errors so serious that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment, and that counsel's deficient performance was prejudicial, *i.e.*, that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different") (quotation marks and citations omitted). A court's "evaluation of counsel's performance is 'highly deferential,'" and a court "must 'indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" *United States v. Toms*, 396 F.3d 427, 432 (D.C. Cir. 2005) (quoting *Strickland*, 466 U.S. at 689). "The defendant bears the burden of proving that his lawyer made errors 'so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment' and that counsel's

deficient performance was prejudicial." *United States v. Geraldo*, 271 F.3d 1112, 1116 (D.C. Cir. 2001) (quoting *Strickland*, 466 U.S. at 687).

## III. ANALYSIS

### A. *Cronic* Is Inapplicable

Mr. Franklin's appellate lawyers argue that his trial lawyers' concession strategy was *per se* constitutionally deficient under *Cronic* "[b]ecause trial counsel conceded to the majority of the government's case against Mr. Franklin from the start of the trial" and "not only entirely failed to subject the government's case to adversarial testing on the conceded counts but went so far as to bolster the government's case . . . ." Def.'s Mem. in Supp. of Claim of Ineffective Assistance of Trial Counsel ("Def.'s Mem.") [Dkt. # 1069] at 12. The Court does not agree.

*Cronic* is "reserved for situations in which counsel has entirely failed to function as the client's advocate." *Florida v Nixon*, 543 U.S. at 189. Notwithstanding Mr. Franklin's appellate lawyers' characterization, his trial counsel did not "entirely fail" to function as Mr. Franklin's advocate because counsel vigorously contested the drug conspiracy, RICO conspiracy, CCE, § 924(c) gun counts, and all counts relating to the murder of Mr. Lurk and shooting of Mr. Anderson, with the result that Mr. Franklin was acquitted on all of the counts relating to the murder of Mr. Lurk and shooting of Mr. Anderson. In cases such as this, where trial counsel concedes only a portion of the Government's case as part of a strategy to fight the remainder, *Strickland*, not *Cronic*, is the appropriate standard to be applied. *See id.* at 189-92 (*Cronic* inapplicable where defense counsel conceded the defendant's guilt on all of the offenses as part of a strategy to avoid the death penalty); *United States v. Thomas*, 417 F.3d 1053, 1058-59 (9th Cir. 2005) (*Cronic* inapplicable to strategy of conceding some charges in order "to focus on the charges on which [the defendant] had a

-10-

chance"); *Holman*, 314 F.3d at 839 n.1 ("*Cronic* only applies if counsel fails to contest *any* portion

of the prosecution's case; if counsel mounts a partial defense, *Strickland* is the more appropriate

test") (emphasis in original); *Haynes v. Cain*, 298 F.3d 375, 381 (5th Cir. 2002) (*en banc*) ("*Cronic*

is reserved only for those extreme cases in which counsel fails to present any defense").[4]

### B. Mr. Franklin Has Not Shown Trial Counsel's Performance To Have Been Deficient

Mr. Franklin's appellate lawyers argue in the alternative that his trial lawyers'

concession strategy was deficient under *Strickland* because the concessions "all but guaranteed that

Mr. Franklin would be sentenced to life imprisonment in this case." Def.'s Mem. at 14. In order to

establish that his trial counsel's performance was deficient, Mr. Franklin "must show that counsel's

representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688.

"[S]trategic choices made after thorough investigation of law and facts relevant to plausible options

are virtually unchallengeable." *Id.* at 690; *see also Knowles v. Mirzayance*, 129 S. Ct. 1411, 1420

(2009) (same).

Judged against this standard, Mr. Franklin's argument must fail. Many of the drug

distribution counts were incontestable: the Government had video and audiotape of Mr. Franklin

selling to undercover officer Donna Leftridge and they had video from pole cameras showing him

delivering drugs to street sellers. Whether 18th and M Streets N.E. are within 1,000 feet of a school,

---

[4] Mr. Franklin's reliance on *United States v. Swanson*, 943 F.2d 1070 (9th Cir. 1991), is misplaced. *Cronic* was applied there because defense counsel "told the jury that no reasonable doubt existed as to his client's identity as the perpetrator of the only crime charged in the indictment." *Id.* at 1076. The court "recognize[d] that in some cases a trial attorney may find it advantageous to his client's interests to concede certain elements of an offense or his guilt of one of several charges." *Id.* at 1075-76. *See also Thomas*, 417 F.3d at 1058 (*Swanson* "applied *Cronic* because counsel's concession concerned the only factual issues in dispute on the only count that was charged").

as the Government proved, was incontestable once it was measured. Whether it was Mr. Franklin

talking to his wife or his co-conspirators on his cell phone was incontestable for at least some of the

calls, particularly since his wife and a number of the co-conspirators had plea agreements that

required them to testify truthfully. Whether Mr. Franklin was a felon-in-possession of a gun was

incontestable inasmuch as Mr. Franklin was a convicted felon and guns were found in a search of

his home and car.

Because there was "overwhelming evidence" on these counts, Mr. Franklin "was, in

effect, caught red-handed" and his lawyers "saw a need to concentrate the defense on those counts

that carried the stiffest penalties." *Thomas*, 417 F.3d at 1058. Accordingly, Mr. Tuminelli "had a

sensible reason for not contesting" those charges; they were, "for all practical purposes,

incontestable, and he believed that doing so would enhance his credibility on counts where the

evidence was somewhat less clear and the penalties significantly greater." *Id.*; *see also Holman*, 314

F.3d at 840 ("Conceding an indefensible charge is thought to build credibility with a jury by

acknowledging the overwhelming evidence of guilt for that particular charge, creating goodwill and

trust that can be applied towards arguments attacking the remaining charges."). Under these

circumstances, where trial counsel made a strategic choice to concede to charges as to which there

was overwhelming evidence of guilt in an effort to build credibility with the jury with respect to

other charges as to which the evidence of guilt was less convincing, Mr. Franklin has failed to show

that his trial counsel's representation fell below an objective standard of reasonableness.

It was a risky option, to be sure. Mr. Franklin had spoken openly with law

enforcement on six occasions, trying to work out a cooperation plea. Nothing he told the

Government could be used against him at trial *unless* he offered contrary testimony or evidence.

Therefore, his lawyers were limited as a defense case to cross examination of Government witnesses. The CCE count and the counts associated with the murder of Mr. Lurk were the most dangerous and, if convicted, would yield statutory mandatory life sentences. If convicted on the narcotics conspiracy counts, Mr. Franklin faced a Guidelines range of life imprisonment. To avoid such a sentence, it would be necessary to avoid unfavorable verdicts on the narcotics conspiracy, the RICO conspiracy, CCE,[5] and the murder. To avoid conviction on the narcotics conspiracy, Mr. Tuminelli proposed to argue to the jury that Mr. Franklin was a wholesale supplier of drugs to a lot of small independent drug sellers with whom he had merely an arm's length relationship. If they were successful on the narcotics conspiracy, the RICO and CCE counts would fail as well. The murder of Mr. Lurk required a different strategy, which proved successful and, in fact, Mr. Franklin was acquitted on those counts.

Appellate counsel contends that this strategy was deficient because Mr. Franklin rejected a plea to go to trial with no chance of successfully avoiding a life sentence; he argues that a "wholesaler" and a "leader" are first cousins. Appellate counsel asserts that trial counsel conceded that Mr. Franklin had distributed at least 10 gallons of PCP, which would result in a base offense level of 36 under the United States Sentencing Guidelines;[6] that trial counsel further conceded that Mr. Franklin distributed drugs within 1000 feet of a school, adding one more level; that trial counsel

---

[5] The components of CCE were proof that Mr. Franklin led five or more people and that he distributed 30 kilograms or more of PCP.

[6] Under the 2008 Sentencing Guidelines 2.D.1.1, 30 kilograms or more of PCP is an offense level 38; at least 10 but fewer than 30 kilograms of PCP is an offense level 36. On cross examination, Mr. Tuminelli got Herbert Martin, Mr. Franklin's main supplier, to back down on the quantity estimate he had provided on direct examination to say that he had sold at most 10 gallons of PCP to Mr. Franklin. Twelve gallons equals approximately 31 kilograms.

further conceded Mr. Franklin's gun possession, adding two more offense levels; and that — by arguing that Mr. Franklin was a "wholesaler" of PCP — trial counsel effectively conceded that he played a major role, thereby increasing his offense level by four. Adding 36 + 1 + 2 + 4, appellate counsel contends that trial counsel's concessions resulted in an adjusted offense level of 43, which would lead to a Guidelines sentence of life. Mr. Franklin testified that he would have plead guilty and cooperated had he known that the concessions could have resulted in a life sentence.

The argument has obvious facial appeal and must be considered carefully within the circumstances presented at the time and without the benefit of hindsight. *Strickland*, 466 U.S. at 689. As described by Mr. Tuminelli, in January 2006, after the Court denied defense suppression motions, Mr. Franklin was between a rock and a hard place. The Government's plea offer depended on his cooperation and testimony; Mr. Franklin tried hard to persuade his brother and cousin to cooperate too, so that he could accept the deal, but they refused. Mr. Franklin then refused as well. Since the Government's offer was conditioned on Mr. Franklin's cooperation, which he felt unable to provide, his options were: 1) plead guilty to the entire indictment; or 2) go to trial and attempt to salvage a life after prison. Because Mr. Franklin was unwilling to accept a cooperation plea, his lawyers chose the only available option: go to trial and attempt to avoid convictions that would necessarily result in a life sentence.

Although the United States Sentencing Guidelines were mandatory when the M Street Crew was taken down, by the time of trial, they had been declared advisory only by the Supreme Court. *See United States v. Booker*, 543 U.S. 220, 245 (2005). However, at sentencing, a federal district court always begins with a Guidelines analysis and then relies on the other statutory factors at 18 U.S.C. § 3553(a) to determine whether a sentence in the Guidelines range, a downward

-14-

departure, or a variance from the Guidelines should be imposed. *See Gall v. United States*, 552 U.S. 38, 49-50 (2007). If the jury had believed that Mr. Franklin was a wholesale seller to a neighborhood of independent drug dealers, and that there was no conspiracy among them, the total quantity of drugs might have been affected and he might also have fought off the four-point bump for leadership role and received less than four. Appellate counsel is entirely correct that a jury finding reasonable doubt would not preclude the sentencing judge from finding proof of leadership by a preponderance of the evidence, but if the case had fallen apart and no conspiracies, CCE, or murder were proved to the jury's satisfaction, it is highly speculative to guess what a sentencing judge may or may not have found. In addition, even if some counts could have triggered a Guidelines range that included life, the Guidelines are no longer mandatory and counsel would have been able to argue for less, if there were no convictions on counts which carried statutory mandatory life sentences.[7] Appellate counsel's assertion that Mr. Franklin would have received a life sentence even if the concession strategy had succeeded is mere conjecture.

Appellate counsel argues that "reasonably competent defense counsel should have known that a four level enhancement for major role was all but assured" because "[t]he government's evidence easily showed, certainly by a preponderance of the evidence, that Mr. Franklin was 'an organizer or leader of a criminal activity that involved five or more participants.'"

---

[7] Based on the charges in the superseding indictment, if Mr. Franklin were convicted of the murder of Mr. Lurk, he would have received a statutory mandatory life sentence on Counts 2 (RICO), *see* 18 U.S.C. § 1963(a), and 130 (violent crime in aid of racketeering), *see* 18 U.S.C. § 1959(a)(1). If he were convicted as a principal in the CCE count (with a finding of at least 30 kilograms of PCP), he faced another statutory mandatory sentence of life. *See* 21 U.S.C. § 848(b)(2)(A). If he were convicted of the drug conspiracy and counts 44 and 67, with a finding that he distributed at least 30 kilograms of PCP, distributed within 1000 feet of a school and played a leadership role in the offense, he faced a Guidelines range of life imprisonment. *See* U.S.S.G. §§ 2D1.1, 2D1.2, 3B1.1.

Def.'s Post-Hearing Mem. [Dkt. # 1092] at 2 (quoting U.S.S.G. § 3B1.1). With the full trial behind us — close to 100 witnesses, 1,000 exhibits — the full strength of the Government's case is obvious. All subsequent co-defendants entered pleas except Larry Gooch, who was facing (and avoided) the death penalty. Mr. Franklin himself wrote to Mr. Blackson that Mr. Franklin had a 99.99% chance of conviction and a life sentence. *See* Dkt. # 1090, Ex. 5. Clearly both Mr. Franklin and his lawyers recognized that a plea was his best avenue but no lawyer can make that decision for the client. *E.g., Florida v. Nixon*, 543 U.S. at 187 ("counsel lacks authority to consent to a guilty plea on a client's behalf"). Despite the odds and the advice of his lawyers, Mr. Franklin would not cooperate since it meant testifying against his brother and cousin. Mr. Tuminelli decided he had one chance: gain credibility with the jury by admitting the obvious and try to avoid guilty verdicts on the rest. He feared that if they attacked the Government's case as a whole — challenging the guns found at Mr. Franklin's home and in his car, his sales of PCP caught on videotape, and his phone calls caught on audiotape — everything would be lost in the face of such overwhelming evidence.

The defense strategy was an attempt to thread a very small needle, and it ultimately failed. But the fact that the strategy failed does not mean that it had no chance of success or that counsel was ineffective by employing it. "It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Strickland*, 466 U.S. at 689. Likewise, having been convicted by a jury and sentenced to life in prison, it is all too tempting for Mr. Franklin to now say that he would have agreed to a cooperation plea and not gone to trial had he known that he *could* have received a life sentence even if the concession strategy had succeeded. In light of the strength of the Government's

case and Mr. Franklin's steadfast refusal to testify against his brother and cousin, trial counsel's concession strategy was entirely reasonable. The strategy was the product of "'trial counsel's informed tactical choice'" and not "'a decision undertaken out of ignorance of the relevant law.'" *Reeves*, 2009 WL 3735511, at *5 (quoting *Mouling*, 557 F.3d at 668-69).

### C. Mr. Franklin Has Not Shown Prejudice

"An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691. "[A]ny deficiencies in counsel's performance must be prejudicial to the defense in order to constitute ineffective assistance under the Constitution." *Id.* at 692. To demonstrate prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694; *see also Mouling*, 557 F.3d at 668 (under *Strickland* a defendant must show "that counsel's deficient performance was prejudicial, *i.e.*, that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different") (quotation marks and citations omitted).

Assuming that trial counsel's concession strategy was unreasonable, Mr. Franklin's ineffective assistance claim still fails because he has not shown that there is a reasonable probability that, but for his trial counsel's concession to the distribution, telephone, and felon-in-possession counts, the result of the trial would have been different. Had those concessions not been made, trial counsel still would have had to convince the jury and the sentencing judge that Mr. Franklin was not a leader of a narcotics distribution conspiracy. Moreover, trial counsel would have had to do so while also contesting narcotics distribution charges as to which there was overwhelming evidence

-17-

of guilt, thereby undermining trial counsel's credibility with the jury. Appellate counsel has not articulated, let alone shown, how the trial strategy prejudiced Mr. Franklin's ability to defend against the conspiracy charges. Trial counsel contested Mr. Franklin's leadership role in a drug conspiracy. Mr. Franklin has not shown that there is a reasonably probability that, but for the concessions, he would have been acquitted of the conspiracy charges and would have avoided a four-point increase in his offense level for a leadership role.

Nor has Mr. Franklin shown that there is a reasonable probability that he would have accepted the Government's cooperation plea offer had he known that he could have gotten a life sentence under the concession strategy. Mr. Franklin testified that before making his decision to go to trial, he knew a conviction could result in a life sentence. Tr. I, 44 (Franklin) ("Q. You were aware prior to trial that a sentence of life if you were convicted by the jury was a possibility? A. Yes."). He further testified that before agreeing to the trial strategy, he had consulted with his lawyers "a couple of times" about the potential sentencing ramifications of employing the strategy, and understood that he would avoid a life sentence only "if everything went like [Mr. Tuminelli] wanted it to go." *Id.* at 57, 58. Mr. Franklin testified that Mr. Tuminelli "didn't promise me that the strategy would work," that he "was being optimistic at the time," and that he "wanted to believe that . . . the best outcome of the case would happen." *Id.* at 105-06. He elected to go to trial against the advice of his trial counsel to "take the cooperation agreement" and despite knowing that the Government had a "very strong" case against him. *Id.* at 50, 51. Against this backdrop, the Court does not credit Mr. Franklin's assertion that he would have accepted the Government's cooperation plea offer and testified against his brother and cousin had he known that he *could* have received a life sentence under the concession strategy.

## IV. CONCLUSION

For the foregoing reasons, the Court will deny Mr. Franklin's § 2255 motion for a new trial because of ineffective assistance of trial counsel. A memorializing Order accompanies this Memorandum Opinion.

Date: December 2, 2009

ROSEMARY M. COLLYER
United States District Judge